**AFFIRMED and Opinion Filed April 3, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

**No. 05-17-01437-CV**
_____

**IN THE INTEREST OF A.D.J., A CHILD**

**On Appeal from the 255th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-16-19730**

## MEMORANDUM OPINION

Before Justices Whitehill, Molberg, and Reichek
Opinion by Justice Reichek

C.D.J., the mother of A.D.J., appeals the trial court's final decree of divorce following a jury trial. In seven issues, Mother generally challenges: (1) the trial court's ruling allowing D.W.D, A.D.J.'s father, to amend his petition twelve days before trial; (2) the trial court's purported limitation of evidence regarding A.D.J.'s best interest; (3) the jury's determination that Mother and Father were informally married when A.D.J. was born; (4) the award of $5,000 in attorney's fees to Father; and (5) the trial court's division of property. For the reasons discussed below, we overrule appellant's issues, and affirm the trial court's judgment.

### Factual and Procedural Background

On September 13, 2016, Father filed an original petition for divorce. Although the petition stated the parties were married on or about August 1, 1992, Father later asserted that he and Mother were informally married under the laws of the State of Texas. In his original petition, Father requested that he and Mother be appointed joint managing conservators of A.D.J, the youngest of

their three children, but that he be given the exclusive right to designate A.D.J.'s primary residence. In response, Mother filed a general denial.

On August 15, 2017, one month before trial was scheduled to begin, Mother filed a no-evidence motion for summary judgment stating that Father "has alleged the existence of a valid informal marriage." Mother asserted there was no evidence that she and Father agreed to be married or that they held themselves out as married. On September 6, Father filed a response to the motion arguing there were genuine issues of material fact regarding the elements of informal marriage challenged by Mother. In support of the response, Father submitted multiple affidavits from witnesses stating they knew Mother and Father as a married couple. One affidavit was from a licensed marriage therapist who stated she met with Mother and Father for marital counseling. Father later filed a supplemental response attaching an affidavit in which he testified he and Mother agreed to be married "on or about October 1, 1988."

On the same day he filed his response, Father filed an amended petition stating that he and mother had created an informal marriage on or about October 1, 1988. Father further requested that, in the event no informal marriage was found, the court render an order establishing his parent-child relationship with A.D.J. In a section of the amended petition entitled "Request for Temporary Orders," Father asked the trial court to order Family Court Services to interview A.D.J. "to determine the child's desires as to which parent should have the right to designate the primary residence of the child."

Two days later, Mother filed "Objections to Petitioner's Request for Temporary Orders and Setting of Hearing and, in the Alternative, Respondent's Request for Temporary Orders." In her motion, Mother argued the request for temporary orders was untimely because there was no time to have a hearing on the request before trial which was scheduled to begin in ten days. Mother then went on to assert that it was in A.D.J.'s best interests for her to be appointed joint managing

conservator with the exclusive right to establish A.D.J.'s residence and asked the court to render temporary orders regarding medical and child support.

During the pretrial conference on September 18, the trial court addressed Mother's objections and both parties' requests for temporary orders. Because trial was to begin in the case that afternoon, the court struck both sides' requests for temporary orders. Father noted that, as part of Mother's request for temporary orders, she had asserted she should be granted the exclusive right to designate A.D.J.'s primary residence. Father argued that Mother had no pleadings on file to support this request and, therefore, the question of whether Mother should be named primary managing conservator should not be presented to the jury. In the alternative, Father requested a continuance of the trial to conduct discovery on the issue since it had not been previously pleaded.

After confirming with Mother's counsel that the only pleading Mother had on file was a general denial, the trial court stated there would be no jury question on the issue of whether Mother should be named primary managing conservator. The only issues presented to the jury were: (1) whether Mother and Father were married; (2) whether Mother and Father were married when Mother started her employment in 1990; (3) whether Mother and Father were married when A.D.J. was born in 2007; (4) whether Father should be named the joint managing conservator with the exclusive right to designate A.D.J.'s residence; and (5) the reasonable fee to which each attorney was entitled. The charge instructed the jury that "[a] man and woman are married if they agree to be married and after the agreement they lived together in Texas as husband and wife and there represented to others that they were married."

At trial, Father called his and Mother's two adult sons as witnesses. The oldest son, Christopher, who is autistic, testified he still lived in the family home, but that he was attending classes to be more independent. He said he liked living at home with Father and his brothers and that he generally went to Father, rather than Mother, when he needed something. He said he and

–3–

Mother did not get along because she would curse at him and call him the "B word" which made him upset. Although Christopher said his Father was the one who took care of him, he also stated he once called Adult Protective Services about Father. Christopher gave no specifics regarding why the call was made.

The second son, Quincy, testified that he also lived at home. He stated Father handled most of the household duties and created a chore list for everyone to follow. According to Quincy, the chore list helped him to be more productive. He said both parents were encouraging him to find a job and be more independent. He also stated that neither he nor Christopher had visited Mother since she moved out of the house six weeks earlier.

Father's mother, Mattie, testified she had been living with Mother and Father for the past two years. Mattie stated Mother and father always held themselves out as married and they had a reputation in the community of being husband and wife. According to Mattie, Father did all the work around the house and Mother did not have much interest in the children. Mattie said she was willing to stay in the home and help Father with the children after the divorce.

Father called several other witnesses to testify including his sister, his cousin, his nephew, and a former co-worker. All of Father's witnesses stated they knew Mother and Father as husband and wife. Father's nephew testified he lived with the parties for a while, and they both referred to each other as husband and wife and introduced themselves to others as husband and wife. Some of Father's witnesses stated that, although they never heard Mother refer to herself as Father's wife, she did not correct Father when he referred to her as his wife. Father's sister testified she thought the parties had been married since the 1980s. Several other witnesses testified Mother and Father began holding themselves out as husband and wife beginning in the 1990s. All Father's witnesses testified that Father was a very attentive and involved parent and that he was seen as the primary caretaker of the children.

Father testified he and Mother began living together in October 1988, and continued to live together until she moved out in July 2017. He stated they discussed being married, but they could not afford a formal ceremony. According to Father, he and Mother simply decided to be husband and wife and he gave her a ring, which she wore. Father stated he and Mother introduced themselves to others as husband and wife and Mother never contradicted him when he referred to her as his wife. Father stated he filed tax returns as a married person from 1993 through 1998, but he could not obtain copies of the filings. He admitted that since 1998 he and Mother had been filing their taxes separately as unmarried people because it was "more beneficial" to them financially. But Father named Mother as his spouse on his current employer's life insurance beneficiary form which he signed in 2008.

Father conceded he had an affair during his relationship with Mother, but stated Mother also had an affair. He said he and Mother attended marriage counseling to help resolve their issues. Father characterized Mother as uninvolved in their children's lives and stated she did not have a good relationship with their older two sons. Father took on the role of primary caretaker, particularly during an eight-year period from 2000 till 2008 when he was unemployed. Even after he went back to work, Father stated he was the one who took care of the house and children.

Mother presented the testimony of several co-workers, her sister and her aunt. All of Mother's coworkers testified that Mother never mentioned being married or having a husband. One co-worker stated Mother generally attended family functions outside of work alone. Three co-workers testified they believed Mother had a good relationship with her children and she worked hard to support her family.

Mother's aunt testified that Mother was a loving and kind mother to her children. She believed Father was dishonest, but stated she had no knowledge of his parenting abilities. Mother's sister testified that Mother and Father were never married, but Mother tried to convince Father that

they should be. She stated Father told her he did not want to get married because it would "mess up" their taxes. She further stated Mother bought a wedding dress to encourage Father to have a wedding. When Mother moved out of the family home six weeks before trial, she moved in with her sister. Mother did not bring any of the children with her, but A.D.J. visited them twice.

Mother testified that she and Father never agreed to be married. She stated she wanted to be married to Father, but she also wanted a wedding. She said she accepted the ring Father gave her only as a gift. Mother conceded that, while Father was unemployed, he took care of the kids and did all the house work while she worked to support the family financially. Mother said Father was controlling with respect to money and assigning household tasks.

Mother admitted she did not have a good relationship with Christopher. She said "I don't hate him. I don't – I just hate his behavior toward me. He is very violent." She stated she did not know why Christopher called Adult Protective Services, but that the people who came to investigate told her it had something to do with a gun. With respect to Quincy, Mother stated she loved him, but Father had turned him against her.

Mother disputed Father's characterization of her as uninvolved with their children. She stated she spent time with them and helped them when she could, but she worked during the day and would visit her mother in the hospital in the evenings. She admitted she had an affair, but said A.D.J. was Father's biological son. She also said they went to couple's counseling but she felt it made their relationship worse.

After hearing the evidence, the jury found that Mother and Father had created an informal marriage. The jury concluded the marriage had not yet been created when Mother started work with her current employer in 1990, but they found it was in existence by the time A.D.J. was born on August 9, 2007. The jury further found it was in A.D.J.'s best interest that Father be named the joint managing conservator with the exclusive right to designate his primary residence. Finally,

the jury found a reasonable fee for the necessary services of Father's attorney was $5,000. The jury did not award any fees to Mother's counsel.

The final decree of divorce signed by the trial court conformed to the jury's findings. In addition, the court ordered Mother to pay Father $575 per month in child support. In its division of the marital estate, the court ordered that each party be awarded the car they had been using and the tangible property and cash in his or her possession or subject to their sole control. Each party was also awarded half of the other party's retirement benefits arising out of their employment from August 9, 2007 through September 21, 2017. Mother brought this appeal.

**Analysis**

In her first issue, Mother contends the trial court abused its discretion in "striking [her] objection/answer to [Father's] amended petition." Although Mother asserts the trial court struck her objection, the record shows the trial court struck only her request for temporary orders. By also striking Father's request for temporary orders, the court effectively sustained Mother's only objection to Father's amended petition. Mother did not file an answer to Father's amended petition and she affirmed to the trial court at the pretrial conference that the only answer she had on file was her general denial to the original petition. This answer was not struck.

Mother argues the trial court should not have allowed Father to amend his pleadings less than two weeks before trial because the amendments were a surprise and prejudiced her case. A trial court's decision on whether to allow the amendment of pleadings is reviewed under an abuse of discretion standard. *Perez v. Embree Constr. Grp., Inc.*, 228 S.W.3d 875, 882–83 (Tex. App.— Austin 2007, pet. denied). A trial court may refuse an amendment of pleadings if the opposing party presents evidence of surprise or prejudice or the amendment is prejudicial on its face. *Id.*

The objection filed by Mother in the trial court challenged only the timeliness of Father's request for temporary orders. Mother made no argument, and presented no evidence, that she was

surprised or prejudiced by the amended petition. Even assuming Mother properly preserved this issue for review, she fails to show on appeal how Father's amended petition was either a surprise or prejudicial. Mother states that Father's original petition did not contain a request that he be adjudicated A.D.J.'s parent. This request was added in the amended petition as an alternative in the event the jury did not find that Mother and Father were married at the time A.D.J. was born. A.D.J.'s parentage was not disputed, however, and Mother confirmed in her testimony that A.D.J. was Father's biological son.

Mother further argues the amended petition "changed the whole cause of action by adding a SAPCR [suit affecting the parent-child relationship] after discovery had closed and informal marriage to the amendment." But Father's original petition filed in 2016 explicitly included a SAPCR requesting primary conservatorship of A.D.J. Mother had a year to conduct discovery and file responsive pleadings on this matter. Although Father did not formally plead the creation of an informal marriage until the amended petition, Mother was aware of this claim as evidenced by the fact that she moved for summary judgment on the issue several weeks before the amended pleading was filed. We resolve Mother's first issue against her.

In her second issue, Mother contends the trial court abused its discretion in "not allowing evidence or full cross-examination of [Father] in order to assess 'best interest' [of the child.]" In her argument, Mother sets out a two-page list of the factors to be examined when determining a child's best interest. Mother then goes on to discuss some of the evidence presented at trial, as well as alleged occurrences following trial that are not part of the record on appeal. Mother does not, however, challenge a single evidentiary ruling by the trial court or point to any specific incident of the trial court refusing to allow the cross-examination of Father. Because Mother does not specify any action by the trial court she contends is erroneous, we conclude she has waived this issue on appeal by improper briefing. *See Garza v. Tex. Alcoholic Beverage Comm'n*, 138

S.W.3d 609, 618 (Tex. App.—Houston [14th Dist.] 2004, no pet.). We resolve Mother's second issue against her.

In her third issue, Mother contends the trial court erred in failing to grant her motion for new trial because the jury's finding that she and Father were married when A.D.J. was born was against the great weight and preponderance of the evidence. In her seventh issue, Mother contends the trial court erred in failing to grant her motion for new trial and her motion for judgment notwithstanding the verdict because there was no evidence she and Father created an informal marriage and the evidence established the contrary as a matter of law. In reviewing the factual sufficiency of the evidence, we weigh all of the evidence in the record and overturn the finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In a legal sufficiency review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We must credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *Id*. at 827. A motion for judgment notwithstanding the verdict should be granted only when the evidence is conclusive and the moving party is entitled to recover as a matter of law. *Whitney Nat'l Bank v. Baker*, 122 S.W.3d 204, 207 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

An informal marriage may be proven by evidence the couple agreed to be married and, after the agreement, they lived together in this state as spouses and represented to others in this state that they were married. TEX. FAM. CODE ANN. § 2.401(a). An agreement to be informally married may be established by direct or circumstantial evidence. TEX. FAM. CODE ANN. § 2.401(a)(2); *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). Evidence of cohabitation and holding out the other party as one's spouse may constitute some evidence of an agreement to be

married depending on the facts of the case. *Assoun v. Gustafson*, 493 S.W.3d 156, 160 (Tex. App.—Dallas 2016, pet. denied). Because in modern society it is difficult to infer an agreement to be married from cohabitation, evidence of "holding out" must be particularly convincing to be probative of such an agreement. *Id.* Holding out requires more than occasional references to each other as "wife" or "husband." *Smith v. Deneve*, 285 S.W.3d 904, 910 (Tex. App.—Dallas 2009, no pet.). A couple's reputation in the community as being married is a significant factor in determining the holding out element. *Id.*

In this case, it is undisputed that Mother and Father lived together for almost thirty years and had three children together. Father presented numerous witnesses who testified that he and Mother had a reputation in the community of being married. The witnesses further testified that Father and Mother, while in Texas, consistently held themselves out as spouses. Mother wore a ring Father gave her and the two attended marriage counseling. Father also listed Mother as his spouse on his life insurance beneficiary form. A copy of the form was admitted at trial.

Mother points to the fact that she bought a wedding dress and never used it as evidence that she and Father never married. But this evidence shows only that Mother and Father did not have a wedding, which Father does not dispute. It does not contradict Father's evidence that they were informally married and that they represented themselves as husband and wife. This is particularly so in light of substantial testimony that Mother never corrected Father when he introduced her as his wife. Mother presented no evidence to show she denied to others that she was married or that she affirmatively represented herself in the community as being single when Father was stating otherwise. Mother's witnesses merely testified she never talked about being married or referred to Father as her husband.

Mother also points to the fact that Father is not listed as the biological parent on their older two son's birth certificates and none of the boys have Father's last name. This evidence pertains

more to the parentage of the children than whether Mother and Father were married. Mother does not dispute that Father is the biological father of all three children. Father testified he did not mind the children using Mother's last name because it was the same as his mother's last name.

Mother argues the jury's finding that she and Father were married when A.D.J. was born is unsupportable because Father did not plead A.D.J.'s birthday as a "date of marriage." The jury was not asked to determine a "date of marriage," however. Instead, the jury was asked to determine whether Mother and Father were married at the time of two different events: either (1) when Mother began her job in 1990 or (2) when A.D.J. was born in 2007. By answering "yes" only to the latter, the jury necessarily found that Mother and Father created a common law marriage sometime between 1990 and 2007. This finding is supported by the testimony of several witnesses who stated that Mother and Father began holding themselves out as husband and wife during the 1990s. We conclude the evidence is both legally and factually sufficient to support the jury's finding that Mother and Father were married when A.D.J. was born and the trial court did not err in denying Mother's motion for new trial and motion for judgment notwithstanding the verdict. We resolve Mother's third and seventh issues against her.

In her fourth and sixth issues, Mother contends the trial court erred in including an attorney's fees issue in the jury charge and in awarding attorney's fees to Father because there is no statutory authority to award attorney's fees in this case. It is clear the trial court had authority to award attorney's fees under both sections 6.708(c) and 106.002(a) of the Texas Family Code. These sections authorize fee awards in suits for dissolution of a marriage and suits affecting the parent-child relationship. *See* TEX. FAM. CODE ANN. §§ 6.078(c), 106.002(a). In making the award, however, the trial court stated that the attorney's fees incurred by Father were "necessary as support" for Father and A.D.J. Although the trial court had authority to award fees, it did not

have authority to characterize the fees as "necessaries" which could be enforced as a child support obligation. *See Tucker v. Thomas*, 419 S.W.3d 292, 300 (Tex. 2013).

In *Tucker v. Thomas*, the Texas Supreme Court noted that, generally, awards of attorney's fees are enforceable only as a debt. *Id.* at 297. Absent specific legislative authorization, such as granted in actions to enforce child support obligations, the court may not order the payment of attorney's fees to be enforceable in the same manner as a support obligation. *Id.* at 300. This is because support obligations may be enforced by means of contempt and the Texas Constitution prohibits a trial court from confining a person under its contempt powers to enforce a judgment for a debt. *Id.* at 297. Because the statutes authorizing an award of attorney's fees in this case do not allow the award to be enforced as anything other than a debt, the trial court erred in characterizing the fees as a support obligation.

Although the trial court's characterization of the fees was error, we conclude the error was harmless. In the decree, the trial court ordered that the attorney fee award was enforceable "by any means available for the enforcement of a judgment for debt." By including this language, the court eliminated the possibility of using its contempt powers to enforce the fee award. Because the court properly ordered the fee award could only be enforced as a judgment for a debt, its characterization of the award as a support obligation has no effect. We resolve Mother's fourth and sixth issues against her.

Finally, in Mother's fifth issue she contends there is insufficient evidence in the record to support the trial court's division of the community estate. The community assets specifically divided by the court in the divorce decree were the parties' respective retirement accounts and their two automobiles. Mother does not identify any other community assets that needed to be divided. With respect to the retirement accounts, Mother argues the trial court erred in "awarding [Father] $7,000 cash from [Mother's] pension and [not awarding] her anything from [Father's]

–12–

pension." But the divorce decree awards each party 50% of the other party's retirement benefits which accrued during their marriage. For this purpose the trial court set the dates of marriage at August 9, 2007 through September 21, 2017. Mother makes no showing that an equal division of the parties' retirement benefits is unfair or inequitable.

Mother argues the trial court failed to take into account funds Father allegedly took from their son Christopher's supplemental security income. Even if the evidence supported Mother's allegation that Father improperly used some of his son's income, she cites no authority and makes no argument to explain how or why their adult son's income should be factored into the court's division of their retirement benefits or its decision to award each party one of the cars. Mother also asserts Father controlled her money and checks and "never accounted for her funds." But mother does not cite any authority or make any argument regarding how his use of the money she earned was improper, what amounts were involved, or how it should affect the division of the community property. We resolve Mother's fifth issue against her.

We affirm the trial court's judgment.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

171437F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF A.D.J., A CHILD

No. 05-17-01437-CV

On Appeal from the 255th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-16-19730.
Opinion delivered by Justice Reichek.
Justices Whitehill and Molberg participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Danny Denmark recover his costs of this appeal from appellant Coretta D. Jones.

Judgment entered April 3, 2019